IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Kelley Craig-Wood,

    Plaintiff,

v.

Time Warner NY Cable LLC,

    Defendant.

Case No. 2:10-cv-906

Judge Graham

Magistrate Judge Kemp

OPINION AND ORDER

This matter is before the court on a motion for summary judgment pursuant to Fed. R. Civ. Pro. 56(c) filed by defendant Time Warner NY Cable LLC (Time Warner). (Doc. 52.) Plaintiff is Kelley Craig-Wood (Craig-Wood), a former employee of Time Warner.

**I.    Factual Background**

The record in this case is over 2,000 pages long including hundreds of pages of deposition testimony. The factual background spans several years. In a fact-intensive case like this, it would be helpful for the plaintiff to clearly lay out the facts relevant to her case with citations to the extensive record. Plaintiff has not provided a clear narrative in her response to the defendant's motion for summary judgment, but instead has provided a selection of facts that at times relate to the issues raised in defendant's summary judgment motion. The Court is left to scour the voluminous record to assemble the key facts that are relevant to the plaintiff's claim. Though the Court has attempted to perform this task, the parties are reminded of their responsibility to direct the court to the facts necessary and relevant to their positions. See In re Morris, 260 F.3d 654, 665 (6th Cir. 2001).

Plaintiff's Employment with Time Warner

Plaintiff began working for Time Warner on June 5, 2006 conducting "inbound sales." (Craig-Wood Deposition, Doc. 67 at 56.)  In March of 2008 she was promoted to the position of "direct sales representative or DSR." (Doc. 67 at 57.)  As a DSR, she was paid a salary, but much of her income came from commissions. (Doc. 67 at 58.)  Her commissions were based on her sales from selling Time Warner products, primarily going door-to-door to existing and potential customers' homes. (Doc. 67 at 103-04.)  As a direct sales representative, plaintiff was initially supervised by Phil Thompson. (Doc. 67 at 90.)  In April or May of 2008, Bianca Beckley was promoted to a supervisor position and became plaintiff's direct supervisor. (Doc. 67 at 90.)  Plaintiff is white and was over 40 while employed by Time Warner, Beckely is under 40 and African American. (Doc. 63 at 1, 7.)  Beckley reported to Ty Harris, the manager of the southeast group.  Harris is also African American. (Doc. 63 at 6.)  Beckley was terminated from the company during plaintiff's tenure, and plaintiff was moved to a different team and was supervised by Ken Craig and Trina Beeching. (Doc. 67 at 187.)

Plaintiff was terminated by Time Warner in March of 2010. (Doc. 67 at 178.)  She was terminated at the end of a series of periods in which she was on medical or disability leave.  Plaintiff's first medical leave began on March 23, 2009. (Doc. 67 at 178.)  When her medical leave was exhausted, she took short-term disability leave and returned to work on August 10, 2009. (Doc. 67 at 175.)  She took medical leave once again on September 15, 2009. (Doc. 67 at 175.)  In November of 2009, plaintiff received a letter informing her that her leave under the Family and Medical Leave Act had been exhausted, and that if she did not return to work on November 16, she would be terminated. (Doc. 67 at 176.)  Upon receiving the letter, plaintiff called human resources

manager Marlo Richardson, told her that she was having a lung biopsy the next day, and asked if the company knew the nature and extent of her health issues.[1] (Doc. 67 at 177.) Richardson said that Unum, the company's disability leave administrator, was reevaluating her claim. (Doc. 67 at 177.) Richardson told plaintiff that she would not be fired on the 16th, which was the following Monday, and that she would send her a corrected letter. (Doc. 67 at 177.) Plaintiff never received a corrected letter. (Doc. 67 at 177.) In the following months, plaintiff continued to be absent on disability leave. (Doc. 67 at 177.) She had hernia surgery in February, and her physician cleared her to return to work on March 8th. (Doc. 67 at 177.) Before she returned to work, plaintiff received a termination notice on March 4, 2010. (Doc. 67 at 178.) Time Warner terminated her because the disability leave administrator had denied her disability leave. (Doc. 67 at 181.)

Plaintiff subsequently filed a charge with the Ohio Civil Rights Commission alleging that she was terminated in retaliation for prior charges that she filed with the commission. (Doc. 67 at 182-83.) No retaliation claim is before the court in this case. (See Order Denying Motion for Leave to File Second Amended Complaint, Doc. 20 at 2.)

Plaintiff's relatively brief tenure as a DSR was a turbulent period for the direct sales department. Several employees were terminated during the period. Plaintiff's claims stem from a number of issues that she had with the function of the department, each of which is examined below.

Route Assignments

Plaintiff alleges that Beckley did not fairly distribute the routes that were assigned to the DSRs. Route assignment is particularly important to DSRs because commissions make up a large

---

[1] The nature and extent of plaintiff's health issues are not clearly reflected in the record, nor are they necessary to resolution of the motion at hand.

3

part of their compensation and some routes are less difficult and more lucrative than others. Plaintiff asserts that she received particularly bad routes. For example, at one point she complained to Beckley and Harris because she had three routes, all with houses that were far apart, requiring her to drive between them. (Doc. 67 at 130.) The roads on one of these routes was nearly impassible in the winter and in bad weather. (Doc. 67 at 130.) When plaintiff complained to Beckley about her poor routes, Beckley's response was that plaintiff should not complain and should not have included Harris, Beckley's supervisor on an e-mail regarding her routes: "Bianca [Beckley] calls my cell phone and starts going off on me. . . . Bianca is coming unglued, you know, well, you didn't have to include Ty [Harris], it looks really negative on you." (Doc. 67 at 131.) Plaintiff described Beckley's call as a "barrage of attack." (Doc. 67 at 131.)

Plaintiff's problems with her route assignments continued when she moved from Beckley's team and was supervised by Trina Beeching. That group, covering Columbus, had as part of its coverage area the Ohio State University campus. During student move-in in the autumn, campus routes were among the most lucrative and coveted. (Doc. 67 at 187.) Plaintiff was initially assigned a campus route prior to student move-in, but she lost the route before the students arrived under a policy requiring her to have 15 sales per week. She had only 10. (Doc. 67 at 188.) Plaintiff subsequently learned that two other DSRs, Mike Linder and Kathy Hunter, had also not met the 15-sale quota, yet had been treated differently and allowed to keep their campus routes. The court is unable to ascertain Linder's or Hunter's race or age. Her charge to the Ohio Civil Rights Commission regarding her loss of the campus route alleges that she lost the route in retaliation for previous charges (a claim that is not raised here), not out of discrimination based on her race or age. (Doc. 67-18.) The stress from losing her campus route caused plaintiff's physician to order her to

stop work and seek disability leave. (Doc. 67 at 192.)

Sales Tactics

Time Warner policy prevents employees from creating false or misleading sales documents (doc. 67 at 62-63), but according to plaintiff, misleading sales tactics were routine and Beckley promoted them. For example, while on a sales call with plaintiff, Beckley encouraged her to sign a customer up for additional services by implying that it would lower their monthly bill when in fact it would raise it. (Doc. 67 at 69-72.) When plaintiff refused, Beckley took over that sales attempt. (Doc. 67 at 71-72.)

Though plaintiff asserts that the misleading sales tactics were promoted by Beckley, she was also disciplined by Beckley for some of those tactics. On October 2, 2008, Beckley issued plaintiff a written warning that purported to place her on a six-month probationary period for "misrepresentation of sales order form." (Doc. 67-10 at 1.) Beckley took this disciplinary action after she "received multiple e-mails from cable store representatives stating that two customers came to the lobby with digital boxes that they never ordered." (Doc. 67 at 121.) The orders for these boxes were created by the plaintiff. On the line where the customer ordinarily would have signed, plaintiff had written "phone order." (Doc. 67 at 76.) It is not entirely clear whether the customers had consented to accept these services and plaintiff simply failed to get their signature, or if she signed them up for services that they did not want. (Compare doc. 67 at 76, with id. at 120.) According to plaintiff, taking phone orders and signing customers up for services that they have not requested were common practices among DSRs, and these practices were encouraged by Beckley. (Doc. 67 at 120.) Plaintiff asserts that she engaged in these violations *less* than other DSRs, yet was disciplined for them while others, especially African-American DSRs, were not. (Doc. 67 at 120,

5

123.)

In February of 2009, during her probationary period, plaintiff was called to a meeting with Beckley and two employees from Time Warner's human resources department, Michelle Blackwell and Marlo Richardson. (Doc. 67 at 76.) At that meeting, plaintiff was again asked to explain work orders on which she had written "phone order" on the signature line. (Doc. 67 at 76-77.) She informed Blackwell and Richardson that she had already been disciplined for those work orders and that she had nearly completed a six-month probation issued by Beckley. (Doc. 67 at 76-77.) Richardson, plaintiff's HR manager, had no idea that such a probationary period was in place and was concerned because probation is not a disciplinary tool used by Time Warner. (Doc. 67 at 76-77.) This was among the unorthodox management techniques and other infractions that ultimately lead to Beckley's termination.

Following the February 24th, 2009 meeting with Beckley, Richardson, and Blackwell, plaintiff was put on leave until February 28th. (Doc. 67 at 132.) According to plaintiff, an investigation during her brief suspension demonstrated that other than the few orders on which she had written "phone order" in the signature box, her order forms were exemplary. (Doc. 67 at 132-33.) Blackwell or Beckley subsequently issued a "final written warning" for the orders on which she had written "phone order." (Doc. 67 at 145.) This warning did not entail any suspension or probationary period. (See doc. 67-13.)

Docking of Vacation Days

At the same meeting where Richardson and Blackwell first learned of plaintiff's probation, plaintiff alerted them to another unorthodox management technique used by Beckley. On days where a DSR would go on a sales route and not make any successful sales, Beckley would count the day

as a vacation day or part of a vacation day, even though the employee had worked. (Doc. 67 at 79-80.) This appears to be in violation of Time Warner policy. (Doc. 67 at 79-80.) Plaintiff heard other DSRs complain about Beckley threatening to dock their vacation time for zero-sales days as well. (Doc. 67 at 159.) Ultimately, Time Warner offered to refund plaintiff's docked vacation time if she were to pay back the vacation pay that she received for those days. Plaintiff declined the offer. (Doc. 63 at 11.)

Harassment

Plaintiff asserts that she was harassed by Beckley from the very beginning of Beckley's time as supervisor. For example, Beckley would not process travel reimbursements in a timely fashion: "she had a tendency to withhold signing your expense report, if you're not making enough sales to make her paycheck better, so to speak." (Doc. 67 at 91.) Beckley would also call DSRs while they were on their sales routes and "giv[e them] all kinds of grief about, well, why didn't you say this or why didn't you say that. And you would get to the point where you're ready to throw up your hands and go back home." (Doc. 67 at 91-92.) Plaintiff repeatedly reported these problems to Beckley's supervisor, Harris. (Doc. 67 at 92.) Plaintiff testified that she heard other employees "grumble" about untimely travel reimbursements, but that she does not know for certain that other DSRs faced this problem. (Doc. 67 at 168.)

Plaintiff asserts that the harassment and mistreatment was worse for her and other white employees than it was for black employees. For example, plaintiff alleges that Beckley yelled at and threatened Alicia Ward, another white DSR. (Doc. 67 at 107.) Plaintiff also asserts that Beckley was friendlier with and more likely to praise black DSRs, especially Tenesia Tyus, Carmella Weiser, and Tarquin Carroll. (Doc. 67 at 109, 114-15.)

7

Application for Other Jobs Within Time Warner

      Plaintiff asserts that while she was on disability leave, she was not allowed to apply for a more attractive DSR position that was open at Time Warner. (Doc. 67 at 197-98.) Plaintiff saw the posting for the position but was told by Richardson on July 24, 2009 that she could not apply for it because she was out on disability leave. (Doc. 67-19.) According to plaintiff, another Time Warner employee, Princess Powe, a thirty year-old African-American DSR applied for and was awarded a different position, even though Powe was on short-term disability leave at the time. (Doc. 67-19.) According to plaintiff, she was treated differently from Powe, a similarly situated employee, because of her age and race. (Doc. 67-19.) Plaintiff's deposition testimony tells a slightly different story, that Powe was on disability leave after being attacked while on her route as a DSR. (Doc. 67 at 203.) While she was out, plaintiff asserts that Powe received a letter informing her that her leave was exhausted, and that she had to return to work or be terminated. (Doc. 67 at 203.) According to plaintiff's testimony, Powe then returned to a different job in the inbound sales department, and once she was there–no longer on disability leave–she applied for the position that she already occupied. (Doc. 67 at 203.)

This Action

      Plaintiff's first amended complaint alleges that Time Warner treated her in an adverse manner and exposed her to a hostile work environment because of her race in violation of Title VII of the Civil Rights Act of 1991, 42 U.S.C. § 2000(e) *et seq.*, and the Ohio Cvil Rights Act, Ohio Rev. Code § 4112.02, and because of her age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq*. (Doc. 3 at 4-6.) Plaintiff sought leave to amend her complaint a second time in order to include a retaliation claim, but the Court denied her motion to amend. (Doc. 20.)

8

In its motion for summary judgment, Time Warner argues that plaintiff's disparate treatment claims fail because she cannot establish a *prima facie* case, particularly that she experienced no adverse employment action, that she was treated no differently than similarly situated employees, and that there is no evidence that the reasons given by Time Warner for its actions were pretextual. (Doc. 52 at 10-15.) Defendant further argues that plaintiff's claim that she was subject to a hostile work environment because of her race must fail because the alleged harassment was insufficiently severe or pervasive, because plaintiff cannot demonstrate that the harassment was because of her race or age, and because she unreasonably failed to report the alleged hostile work environment to Time Warner. (Doc. 52 at 16-21.)

## II. Legal Standard

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Longaberger Co. v. Kolt, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also Longaberger, 586 F.3d at 465. "Only disputed material facts, those

9

'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 702 (6th Cir. 2008) (quoting Anderson, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. Daugherty, 544 F.3d at 702; Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252; see Dominguez v. Corr. Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009).

**III.    Disparate Treatment**

In the absence of direct evidence of discrimination, this Court considers disparate treatment claims under the ADEA, Title VII of the Civil Rights Act of 1991, and Ohio discrimination statutes using the burden-shifting framework initially set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973). See Godfreson v. Hess & Clark, Inc., 173 F.3d 365, 371 (6th Cir. 1999) (ADEA); Michael v. Caterpillar Fin. Servs, 496 F.3d 584, 593 (6th Cir. 2007) (Title VII); Mitchell

10

v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir. 1992) (Ohio law). Initially, plaintiff must establish her *prima facie* case by demonstrating by a preponderance of the evidence that: (1) she is a member of a protected group; (2) she experienced an "adverse employment action"; (3) she was qualified for the position she held; and (4) similarly situated employees outside of the protected group were treated more favorably. See DiCarlo v. Potter, 358 F.3d 408, 417 (6th Cir. 2004) (citing McDonald v. Union Camp Corp., 898 F.2d 1155, 1159-60 (6th Cir. 1990)); Johnson v. University of Cincinnati, 215 F.3d 561, 572 (6th Cir. 2000). Once a plaintiff has established a *prima facie* case, the burden shifts to the defendant to produce evidence of a non-discriminatory purpose for the adverse employment action. Barnes v. GenCorp, Inc., 896 F.2d 1457, 1464 (1990). The burden then shifts back to the plaintiff to demonstrate her case by a preponderance of the evidence. Id.

Defendant argues that plaintiff has failed to establish her *prima facie* case in two ways: that she has not demonstrated an adverse employment action and that she was treated similarly to, if not more favorably than, similarly situated employees. Defendant further argues that it has articulated non-discriminatory reasons for all employment actions regarding Plaintiff and that she has provided no evidence that those reasons are pretextual.

    *i.    Adverse Employment Action*

To establish a *prima facie* case that she received disparate treatment from her employer because of her age or race, plaintiff must show by a preponderance of the evidence that she was subject to an adverse employment action. This action must be a "materially adverse change in the terms of her employment. . . . [The Sixth Circuit] has held that reassignements without salary or work hour changes do not ordinarily constitute adverse employment decisions . . . ." Kocsis v. Multi-Care Management, Inc., 97 F.3d 876, 885 (6th Cir. 1996) (citing Yates v. Avco Corp., 819

11

F.2d 630, 638 (6th Cir. 1987)).  "[D]e minimis employment actions are not materially adverse and, thus, not actionable."  Bowman v. Shawnee State Univ., 220 F.3d 456, 462 (6th Cir. 2000).

Defendant argues that neither of two actions taken by Beckley constitute an adverse employment action: the six-month probationary period and the docking of plaintiff's vacation time for a day with no sales.  (Doc. 52 at 10.)  In her response to defendant's motion for summary judgment, plaintiff identifies two additional actions that she argues constitute adverse employment actions–her termination and the route assignment process by which plaintiff alleges she received disproportionately bad routes.  (Doc. 63 at 10, 14.)

Termination is an adverse employment action.  Time warner does not dispute this, but argues that plaintiff's termination is not before the Court: "Plaintiff's termination is not a part of this lawsuit as this Court denied Plaintiff's untimely effort to amend her Complaint . . . ."  (Doc. 52 at 5 n. 2.)  This argument is impossible to square with the text of the first amended complaint: "Plaintiff was terminated on March 4, 2010 . . . ."  (Doc. 3 ¶ 11.)  This allegation is explicitly incorporated into each of the plaintiff's claims.  Though the Court denied plaintiff's motion for leave to file a second amended complaint, the denial of that motion does not limit the substance of the first amended complaint in which the plaintiff plainly asserts her termination as an adverse employment action.

The remaining three actions presented by plaintiff are less clear.  Plaintiff argues that Beckley's route assignments, in which she received unfavorable routes, constitute an adverse employment action.  Taking the facts in the light most favorable to the plaintiff, while her formal job responsibilities remained substantially the same during the period that she was a DSR, plaintiff has testified that completing those responsibilities became more difficult and that her compensation decreased as a result of unfavorable routes assignments.  None of the cases cited by defendant in

attempting to demonstrate that unfavorable route assignments do not constitute an adverse employment action deal with a situation, like this one, where the employment action resulted in the employee receiving less pay.  See Mitchell v. Vanderbilt Univ., 389 F.3d 177, 182 (6th Cir. 2004) (employer considered, but never implemented an action that would have reduced plaintiff's pay); Worthy v. Materials Processing, Inc., 433 Fed.Appx. 374, 375-76 (denial of bathroom break does not constitute adverse employment action); Epps v. FedEx Servs., 438 Fed.Appx. 455, 458 (6th Cir. 2011) (negative performance review that "did not result in a change in position or loss of pay" is not an adverse employment action); Timmons v. Boehringer Ingelheim Corp., 132 Fed.Appx. 598, 599-600 (6th Cir. 2005) ("A transfer at no loss of title, pay or benefits does not amount to an adverse employment action.").  Here, plaintiff has presented evidence that Beckley assigned her unfavorable routes and that this action lead directly to her job being more difficult, and to her receiving less compensation in the form of commissions from Time Warner.

Plaintiff next argues that Beckley docked her one half-day of vacation time for a day that she spent working but did not complete any sales.  Time Warner subsequently offered to refund the vacation time if plaintiff would pay back the vacation compensation that she received.  She declined. Docking vacation time plainly changed the terms of plaintiff's employment–after the time was docked she had less vacation time at her disposal.  Nor is it dispositive that Time Warner offered to refund the time.  There is a factual dispute regarding whether refunding the vacation time would make her whole.  Plaintiff agues that if she paid back her vacation pay, then she would have worked one-half day without pay.  (Doc. 63 at 11.)  If the reimbursement would have left plaintiff uncompensated for time that she worked, it does not make the docking of her vacation time a temporary pay disparity but an adverse employment action.

Finally, plaintiff argues that the six-month disciplinary probation constitutes an adverse employment action. However, criticism and disapproval of an employee's actions do not alone constitute an adverse employment action, even if solidified in the form of a six-month probationary period. Cf. Epps, 438 Fed.Appx. at 458. During this period, plaintiff's job responsibilities, title, and compensation were unaffected by the probation.

  *ii.*  *Similarly Situated Employees*

Having established that plaintiff has presented evidence of three adverse employment actions sufficient to support her *prima facie* case–her termination, the assignment of unfavorable routes, and her loss of vacation time–we turn now to defendant's second argument. Time Warner argues that "[i]t is undisputed that there are no similarly situated employees who were treated more favorably than Plainfiff." (Doc. 52 at 12.)

Regarding her termination, defendant is correct, Plaintiff has identified no similarly situated employee. Plaintiff's termination came at the end of a series of periods during which she was absent on disability leave and Time Warner asserts that it fired her when her leave ran out. In her deposition, plaintiff identified two employees who she believed had taken disability leave and not returned to work, but had not been terminated. (Doc. 67 at 185.) These employees are not mentioned in her brief responding to defendant's summary judgment motion, and plaintiff directs the court to no non-hearsay evidence regarding when their leave expired and whether they were terminated. They do not support her *prima facie* case.

Nor does plaintiff identify similarly situated employees to support her claim that Time Warner docked her vacation time because of her age or race. Plaintiff "heard people say that [Beckley] had threatened to [dock vacation time for zero-sales days]. Whether she actually did it to

14

them, I can't say because I didn't see their paycheck, obviously. But there were several people saying, you know, she is making us take vacation pay." (Doc. 67 at 159.) Plaintiff does not identify who these people were. Nor does she identify any similarly situated employees who had zero-sales days but did not have their vacation docked. The closest plaintiff comes to identifying a similarly situated employee is her assertion that Tarquin Carroll "has never been docked pay . . . ." However, plaintiff does not allege that she was docked pay either, she asserts that she had her vacation time docked. Even if plaintiff were to provide evidence that Carroll had not had his vacation time docked, she does not argue that Carroll had a day with no sales. For plaintiff, a zero-sales day was the event that triggered Beckley to dock her vacation time. If Carroll did not have a zero-sales day, and plaintiff presents no evidence that he did, he is not similarly situated.

Finally, regarding the alleged discriminatory assignment of routes, plaintiff identifies three employees who she argues are similarly situated: Tenesia Tyus, Tarquin Carroll, and Carmen Weiser. Plaintiff argues that Tyus was similarly situated because like the plaintiff, she was a DSR supervised by Beckley. (Doc. 63 at 7.) Tyus is African American. (Doc. 63 at 7.) Plaintiff's responsive brief does not indicate that Tyus is under 40, nor does she direct the Court to any evidence that would support the idea that Tyus could support plaintiff's claim for age discrimination. However, plaintiff testified that Tyus received more favorable routes than she did because of her race. (Doc. 63 at 12.) However, beyond the bare allegation that Tyus was similarly situated and received better routes, plaintiff provides no support for the idea that Tyus *was* similarly situated *in all respects*. "It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of [other] employees, the plaintiff must show that the 'comparables' are similarly situated *in all respects*. Thus, to be deemed 'similarly-situated', the individuals with whom the plaintiff seeks to compare

15

his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992) (citations omitted).  Plaintiff's claim that Tyus was similarly situated fails on the final requirement. The Court is able to ascertain very little about Tyus and whether she and the plaintiff were similarly situated. Plaintiff directs the Court to no evidence by which to ascertain, for example, wether the two had similar attendance records, levels of seniority, disciplinary records, or sales effectiveness. (See doc. 63 at 7.) Without some evidence to demonstrate that the plaintiff and Tyus were similarly situated, Tyus does not support plaintiff's *prima facie* case.

Plaintiff also argues that Tarquin Carroll was a similarly situated employee. Carroll is under 40 and African American. However, in her response, plaintiff does not state that Carroll received more favorable routes than she, or direct the court to any evidence that would support such a claim. Similarly, plaintiff claims that Carmen Weiser is under 40, yet she does not argue or direct the Court to any evidence that Weiser received more favorable routes than the plaintiff.

As described above, the plaintiff has failed to identify a similarly situated employee to support her *prima facie* case that she was discriminatorily terminated, docked vacation time, or assigned poor routes.  Thus, she has not established her *prima facie* case for discrimination based on age or race.

Having found that plaintiff has not established her *prima facie* case that she was subject to adverse employment actions because of her race or age, the Court need not reach Time Warner's final argument, that it has proffered a non-discriminatory reason for the adverse employment action

and that the plaintiff has presented no evidence that the nondiscriminatory reason was a pretext.

**IV.     Hostile Work Environment**

Plaintiff brings claims under Title VII, the ADEA, and Ohio law for a hostile work environment. However, in her response to defendant's summary judgment motion, plaintiff abandons the hostile work environment claim under the ADEA. Her brief addresses only a "hostile environment based on race" and does not direct the court towards any evidence that could support a hostile work environment based on age.

In order to be actionable as a hostile work environment under Title VII, a workplace must be sufficiently "hostile." This is the case "[w]hen th e workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment.'" Harris v. Forklift Sys., Inc., 510 U.S. 17, 20 (1993) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65, 67 (1993)). On the other hand, "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment–an environment that a reasonable person would find hostile or abusive–is beyond Title VII's purview." Id. at 21.

The severity of the environment required by this standard is demonstrated by a case in which the Sixth Circuit held that it was met. In Bailey v. USF Holland, Inc., African-American dock workers and truck drivers alleged a hostile work environment based on race. 526 F.3d 880, 882 (6th Cir. 2008). Over several years, other employees developed the "habit of referring to them as 'boy,' 'hey boy,' or 'damn it boy' . . . ." Id. The hostility, however, went far beyond repeated use of the word "boy" to refer to black employees. One plaintiff "discovered a noose hanging in the dock area." Id. Later, one plaintiff's "tow-motor was vandalized [and t]he word 'boy' appeared spray-

17

painted on the trailer walls and trailer doors, and in the locker rooms; it appeared etched into restroom walls located in the terminal; and it was written in the dust that collected on the dock surfaces. The words 'fuck boy' were written on a fuel pump. Although the defendant took action to remove the graffiti, it returned and persisted . . . ." Id. at 883. Fliers including drawings of black people labeled with the word "boy" began appearing around the workplace, and someone wrote the word "boy" in the square for the Martin Luther King Jr. holiday in a posted calendar. Id. In one other particularly hostile incident, a white employee approached the plaintiff while he spoke with another employee and said "he could call [plaintiff] 'a low-down dirty nigger' and that [plaintiff] would not do anything about it." Id. at 884.

Examination of the evidence proffered by plaintiff demonstrates that her work environment did not approach the level of hostility considered in Bailey. Plaintiff provides testimony regarding a few situations that might support her claim of a hostile environment based on race: African-American DSRs received more favorable routes. (Doc. 63 at 7.) Beckley gave different instructions to black and white employees. (Doc. 63 at 7.) Beckley disciplined white employees for following her instructions. (Doc. 63 at 7.) Beckley told white employees but not black employees not to go to the human resources department with any problems. (Doc. 63 at 7.) Beckley did not dock vacation days from black employees as she did from plaintiff. (Doc. 63 at 6.) Beckley called another black employee a "nigger" in front of white employees. (Doc. 63 at 7.) White employees were not encouraged to apply for promotions while black employees were. (Doc. 63 at 7.) Plaintiff also testified that Beckley was friendlier towards African American employees and more critical of white employees. (Doc. 67 at 109, 114-15.)

To be sure, plaintiff has provided evidence of a number of injustices and instances in which

Time Warner employees treated her and others in an unfair manner. But this evidence falls short of supporting her claim that the work environment was objectively *hostile*. Entirely absent is evidence that the workplace was "permeated with discriminatory intimidation, ridicule, and insult." Harris, 510 U.S. at 20. Because plaintiff has not presented evidence sufficient to support her claim that she experienced a hostile work environment, we need not consider defendant's remaining argument, that her hostile work environment claim is barred because she did not take advantage of Time Warner's preventative and corrective measures.

### V.     Conclusion

Based on the foregoing reasons, the defendant's motion for summary judgment (Doc. 52) is GRANTED. The clerk shall enter final judgment in favor of the defendants dismissing plaintiff's complaint with prejudice.

IT IS SO ORDERED.

S/ James L Graham
James L. Graham
UNITED STATES DISTRICT JUDGE

Date: September 10, 2012